LAWRENCE EDWARD BURNS,           )
                                )
                Plaintiff,      )
                                )
v.                              )
                                )       No. 3:04-0410
ANTHONY PRINCIPI, SECRETARY,    )       JUDGE ECHOLS
DEPARTMENT OF VETERANS AFFAIRS, )
UNITED STATES OF AMERICA, d/b/a )
TENNESSEE VALLEY HEALTHCARE     )
SYSTEM,                         )
                                )
                Defendant.      )

## MEMORANDUM

Presently pending before the Court is Defendant's Motion for Summary Judgment (Docket Entry No. 19) and Defendant's Motion to Dismiss (Docket Entry No. 22), to which the Plaintiff has responded in opposition.

Plaintiff Lawrence E. Burns brought suit against Defendant Anthony Principi, Secretary of the Department of Veterans Affairs, United States of America d/b/a Tennessee Valley Healthcare System ("the VA") asserting claims of race discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* (Count One); race and age discrimination under Title VI, 42 U.S.C. § 2000d, *et seq.* (Count Two); race discrimination under 42 U.S.C. § 1981 (Count Three); age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq* (Count Four); and retaliation

1

under Title VI, Title VII, 42 U.S.C. § 1981, and 29 U.S.C. § 623(d).

## I. **FACTS**

Plaintiff is African American. He was born on June 6, 1950, and was 52 to 53 years old at the time of the events underlying his claims. He received a Bachelor's Degree in Pre-Medicine and Sociology in 1974 from the University of Illinois Chicago. From 1974 to 1978, he attended the Scholl College of Podiatric Medicine in Chicago, and received his Doctor of Podiatric Medicine Degree and a Bachelor's Degree in Biology. From 1978 to 1979, Plaintiff performed his podiatric surgery residency at Lawndale Community Hospital in Philadelphia, Pennsylvania. Following his residency, Plaintiff entered private practice in Chicago for twenty-one years. In 1987 he became board certified by both the American Board of Podiatric Orthopedics and Primary Podiatric Medicine and the American College of Foot and Ankle Orthopedics & Medicine. From 1981 to 1991, Plaintiff served in various instructional capacities at Scholl College, including Clinical Assistant Professor, Instructor and Associate Professor. He worked with numerous students and residents. He also had faculty privileges at hospitals where he worked with students and residents. Plaintiff engaged in numerous educational speaking engagements for approximately twenty years.

Plaintiff was a friend and former classmate of Dr. Leonard Hilt, who was Chief of the Podiatric Section and Director of the Residency Program at the VA Hospital in Murfreesboro, Tennessee. Dr. Hilt is African American and five years older than Plaintiff. In 1998, Dr. Hilt contacted Plaintiff and expressed interest in Plaintiff joining the staff to assist him in developing the residency program. After visiting Tennessee, Plaintiff accepted a position as a "Fee Basis Podiatrist" with the VA, meaning he worked limited hours and was paid by the hour. Plaintiff became licensed to practice podiatric medicine in Tennessee.

The initial appointment covered the period October 23, 1998 to October 22, 1999. Plaintiff worked one day each week at $40.00 per hour. He retained his practice in Chicago and commuted to Tennessee each week. The appointment was extended for one year in October 1999 and extended for two years from October 2000 to October 2002. In December 2002, the podiatric staff included one full-time and three part-time podiatrists, all of whom were African American. (Docket Entry No. 31, Ex. 5, Dutt Depo. at 4.) Plaintiff's duties included performing surgical services as a podiatrist and assisting in the instruction, training and supervision of residents. (Docket Entry No. 21, Burns Depo., Ex. 2.)

The appointment letters the VA provided to Plaintiff stated in part:

3

> As a Fee-Basis Podiatrist you are not considered an
> employee of the Department of Veterans Affairs.
> Therefore, those benefits which normally accrue to
> employees of the Veteran's Health Administration such as
> leave, retirement, etc., are not available to you.
>
> Your appointment is made under the authority of 38 U.S.C.
> § 7405(a)(2) and may be terminated at any time by either
> party by written notice of such intent.

(Docket Entry No. 21, Ex. 2.) Plaintiff acknowledged that he or the VA could terminate the appointment at any time by written notice. (Docket Entry No. 21, Burns Depo. at 26.)

In June 1999 Plaintiff relocated his family to Nashville, Tennessee, but Plaintiff continued to commute to Chicago. He eventually sold his private practice in 2001 because he could no longer commute and sustain two practices and because he thought the VA position would eventually become full time and it was a "growing situation with great potential." (Docket Entry No. 31, Burns Depo. at 38.)

In June and July 1999, Dr. Hilt became ill and took significant time off. As a result, Plaintiff began working two additional days at the VA. In October 1999, his hourly rate increased to $60.00 to compensate him for additional responsibilities. Plaintiff performed the bulk of podiatric surgeries. He claims he was told he would receive a financial percentage from the surgeries he performed, but that promise was not fulfilled.

4

In November 1999, Dr. Hilt left on a two-month sick leave and Plaintiff assumed the position of acting Director of Podiatry position, taking on Dr. Hilt's responsibilities. Plaintiff performed more surgeries, more teaching and more administration. Even when Dr. Hilt returned, he refused to teach or perform surgery. Dr. Asim Dutt, Chief of Medical Services, requested on several occasions that Plaintiff receive a full-time ("FTE") position, but that did not occur because of financial reasons. (Docket Entry No. 31, Ex. 5, Dutt Depo. at 12.) Plaintiff claims he was told the reason he was not placed in an FTE was the existence of a hiring "freeze." Despite the "freeze," he claimed he learned from Ms. Blakely, Chief Operations Officer and Associate Director of Operations, that funds were available for an FTE position. However, Plaintiff conceded that, shortly thereafter, Dr. Dutt wrote a memorandum to management stating he had very conservatively requested only one FTE due to present budgetary restrictions, but he needed two additional FTE's to replace two fee basis podiatrists, and he was requesting two FTE positions. (Docket Entry No. 31, Ex. 1, Burns Depo. at 67.)

The residency program and the podiatric medicine department flourished under Plaintiff's direction. The patient load increased substantially. The Council on Podiatric Medical Education Joint Residency Review Committee issued a report in April 2001 stating:

> Strengths of the program lie in the excellent direction
> provided by the director. All rotations are well

5

rounded, providing the resident with excellent training in the appropriate areas. Overall, this institution possesses tremendous potential to provide excellent results to PPMR [primary podiatric medical residency] training. One of the unique strengths is the competent, dedicated medical faculty, who desire to spend more time teaching the podiatric residents.

* * *

Weaknesses of the program are few. The primary weaknesses noted by the evaluation team were the failure of the director to sign and date the JRRC 652 log form, and the lack of requirement that the residents maintain an activity log.

(Docket Entry No. 31, Tab 2, Burns Depo., Ex. 5 at 4.) Among other things, the report recommended converting the Director's position from that of a fee-basis appointment to an FTE. (Id. at 5.)

On December 11, 2002, the VA terminated Plaintiff's fee-basis appointment. Plaintiff was called to the office of his supervisor, Dr. Asim Dutt, for a meeting that was also attended by Patricia S. Brown, the VA's Chief, Nutrition Food Service, and EEO Manager. Dr. Dutt is an Asian Indian and Brown is an African American. At the time, Dr. Dutt was in his mid-70's and Brown was in her mid-50's. Dr. Dutt provided Plaintiff with a letter written that day by William H. Hardwick, Chief, Human Resources Management Service, addressed to Plaintiff notifying him that his appointment was terminated effective at the close of business that day. The letter stated in part: "This action is being taken as your services are no longer required in Podiatry." (Docket Entry No. 21, Burns Depo., Ex. 6.)

6

Dr. Dutt informed Plaintiff the female resident, Dr. Crear, had complained that day that Plaintiff had harassed her based on gender, including comments related to her pregnancy.[1] (Docket Entry No. 31, Ex. 14, Report of Contact.) Previously, Plaintiff had identified performance and conduct issues with Drs. Crear and Hubbard, who entered the residency program just a few months earlier. (Docket Entry No. 31, Ex. 2, Burns Depo. Ex. 7.) Plaintiff had counseled and disciplined them verbally and in writing. Dr. Crear was at the point of dismissal from the residency program if she received another written warning. Plaintiff denied during the meeting that he committed any wrongdoing with regard to either resident.[2] He expressed concern that he had not been given a copy of the allegations and he had not had a chance to defend himself, but Brown's report of the meeting indicates Dr. Dutt reminded Plaintiff that he had seen and read the allegations. (Docket Entry No. 21, Ex. 8, Brown's Report of

---

[1]Dr. Crear was the first female resident in the program. Plaintiff and other staff elected her to serve as the Geriatric Research and Education resident, a position typically given to the best resident. Thus, she had responsibilities at the Nashville and Murfreesboro VA facilities and attended conferences at Vanderbilt Hospital in Nashville. (Docket Entry No. 31, Ex. 1, Burns Depo. at 72, 96.)

[2]The Equal Employment Opportunity Commission ("EEOC") later issued a preliminary decision that Dr. Crear proved she was the victim of unlawful discrimination based upon a hostile environment theory of employment discrimination. (Docket Entry No. 21, Ex. 11.) On June 23, 2005, the VA filed with this Court a copy of the final EEOC decision in Dr. Crear's favor. (Docket Entry No. 37.)

Contact at 1.) The record does not reveal when and how Plaintiff saw a copy of the allegations against him.

Dr. Dutt informed Plaintiff he had tried to work the matter out, but had been unsuccessful and the matter was "out of his hands." (Id.) Dr. Dutt told Plaintiff there would be a board of investigation concerning the letter the female resident sent to the Director of the VA and other management officials. When Plaintiff asked if he would lose any money, Brown informed him that his fee-basis appointment was terminated effective immediately and he would no longer be paid. Plaintiff asked if he "would get back pay later on," and Brown told him she could not answer, but he should contact Human Resources Management. (Id.) Brown was concerned that Plaintiff thought he would be placed in pay status pending an investigation. She informed him that, based on the type of allegations made against him, management was required to remove him from Podiatry, and because there was no other area where Plaintiff could be reassigned, his fee-basis appointment was terminated. Brown informed Plaintiff to "clear the station" when he left the meeting and directed Plaintiff not to discuss the matter with staff. (Id.)

Plaintiff testified he was told he could not be in the facility while the investigation was conducted and he assumed he would have an opportunity to defend himself. (Docket Entry No. 21, Burns Depo. at 87.) Plaintiff further testified that "as a fee

8

based consultant you are nothing. You have no rights, you have no privileges. You are not entitled to debate if there is an allegation or an accusation. You are not entitled to a hearing or anything. So as far as I'm concerned you are less than a human being if you don't have a right." (Id. at 158.) Dr. Crear alleged Dr. Dutt also verbally harassed her, but Plaintiff claims no action was taken against Dr. Dutt.

Brown and Dr. Dutt acknowledged that the VA did not perform an investigation of Dr. Crear's allegations against Plaintiff before the termination of his appointment. (Docket Entry No. 31, Ex. 6, Brown Depo. at 42; Ex. 5, Dutt Depo. at 7.) Brown interviewed Dr. Crear and prepared a summary of the allegations based on the letter Dr. Crear sent to management in order to prepare for an anticipated administrative board of investigation, "if it had been convened." (Id., Ex. 6 at 43, 56; Ex. 14, Report of Contact; Docket Entry No. 24, Brown Decl. At ¶ 2; Docket Entry No. 26, Kennedy Decl., Attachment A 3-8 to A 3-11.) Brown contacted Dr. Hubbard, a resident who confirmed he felt Plaintiff also harassed him, but the record does not reflect such harassment was based on gender.[3] (Id.

---

[3]The third resident, Dr. Nguyen, testified during an EEOC deposition that no one had previously asked him about Dr. Crear's allegations. He agreed that Plaintiff was "rough to the residents" or anybody that did not listen to him, but Plaintiff was not rough to Dr. Crear in particular. He further stated: "I mean, it's a residency program, if I'm not happy or something, I just do it and get it over with. That's all." He explained that, when "in trouble," Drs. Crear and Hubbard tended to say that another attending physician told them to do something so that Plaintiff could not "say anything to them[.]" He also disclosed that

at 37.)  Brown also contacted Dr. Dutt to obtain information about the discipline of residents.  (Id. at 41.)  She reported her findings to Dr. Dutt and Director Pennington.  (Docket Entry No. 24, Brown Decl. at ¶ 2.)

According to Brown, she discussed Dr. Crear's allegations with a Human Resources representative, Bernie Reid, and the VA's Director, David Pennington.  According to Brown, Pennington made the decision to terminate Plaintiff's appointment.  (Docket Entry No. 31, Ex. 6, Brown Depo. at 27-28.)  Brown testified both that Plaintiff was told he was being terminated until the matter could be investigated and that a board of investigation was not conducted because Plaintiff's fee-basis appointment was terminated.  (Id. at 60, 72.)  Dr. Dutt also confirmed that Director Pennington made the decision to terminate Plaintiff's position.  (Docket Entry No. 31, Ex. 5, Dutt Depo. at 5.)  He did not believe the termination was based on race and denied that he discriminated against Plaintiff based on race or age.  (Id., Ex. 5, Dutt EEOC Depo. at 3-4, 8-9.) He testified due process ordinarily is given to a physician to answer accusations, but Plaintiff did not receive such due process, presumably because he held a fee-basis appointment.  (Id. at 10.) Dr. Dutt was unaware of any similar allegations made against

_____

Plaintiff and Dr. Hilt were constantly fighting and that Dr. Hilt
continually tried to convince Dr. Nguyen to "write something
against [Plaintiff]."  (Docket Entry No. 31, Ex. 15, Nguyan EEOC
Depo. at 13, 15-19.)

another VA physician or a similar appointment termination under similar circumstances. (Id. at 8, 10.)

Brown provides a declaration in which she now avers that she reviewed the VA's personnel regulations and verified that removal is a possible penalty for employee discriminatory conduct. (Docket Entry No. 24, Brown Decl. at ¶ 4.) She also stated that, based on her knowledge and experience with VA personnel policies and regulations, had Plaintiff been recommended for subsequent employment as a Staff Podiatrist, such employment would have been denied due to his alleged misconduct while employed as a fee-basis podiatrist. (Id. at ¶ 5.)

Pennington testified that he had been Director for three months on the day of Plaintiff's termination, that he had never met Plaintiff and did not know his race or age, and that Plaintiff was not a VA employee because he held a fee-basis appointment. Pennington denied he made the termination decision. He stated the "service chief" made the decision. (Docket Entry No. 31, Ex. 3, Pennington EEOC Depo. at 4, 7.) The Chief of Medicine in December 2002 was Dr. Dutt, Plaintiff's supervisor. The Director of Surgical Services was Dr. Naji Abumrad, a 58-year old Caucasian naturalized citizen. (Docket Entry No. 31, Ex. 4, Abumrad EEOC Depo. at 3-4.) Dr. Abumrad testified he did not work with Plaintiff and he was unaware of Plaintiff's race or age. (Id. at 4-5.)

11

On January 21, 2003, Plaintiff contacted the EEO Counselor to initiate the EEO process. On March 6, 2003, he filed an EEO Complaint claiming the VA's refusal to appoint him to an FTE position was racially motivated and his requests for an FTE position was the true reason his fee-basis appointment was terminated. (Docket Entry No. 21, Burns Depo. at 68, 155, 162.) Of approximately 46 podiatric residency programs within VA facilities nationally, Plaintiff believed he was the only acting Director who was not a full-time employee. (Id. at 116.) In addition, of the approximately 46 Directors, Plaintiff claims very few were African American. He contends he sent a memorandum requesting an FTE position fifteen (15) days before his appointment was terminated. In his view, the VA retaliated against him for his persistent requests to be placed in a full-time position.

The VA produced evidence at Plaintiff's deposition showing that seven (7) other Residency Directors of forty-two (42) VA residency programs, not including Tennessee's, held half-time positions. (Docket Entry No. 21, Ex. 2, Burns Depo. Ex. 9.) After looking at the list, Plaintiff admitted he had information he did not have before, but he surmised the individuals holding the half-time slots likely maintain private practices and are not interested in FTE positions. (Docket Entry No. 31, Ex. 1, Burns Depo. at 118-119.)

12

Brown testified she would have been notified of Plaintiff's initiation of the EEO counseling process within five (5) days. (Docket Entry No. 31, Ex. 6, Brown Depo. at 94.) Thus, Brown would have received notice on or before January 26, 2003. According to Plaintiff, Brown notified Director Pennington and Human Resources that Plaintiff had initiated the EEO process.[4] (Id. at 95.)

In March 2003, the VA announced a position for a full-time Director of Podiatry and a full-time position for a Staff Podiatrist at the Murfreesboro facility. Plaintiff received news of the Director position via e-mail from Dr. Jeffrey Robbins, Director of Podiatry Services for the entire VA system. (Docket Entry No. 31, Ex. 1, Burns Depo. at 123.) Plaintiff contacted Dr. Robbins and asked if he would support him for the position. According to Plaintiff, Dr. Robbins "said no. He said that based on the history of the program that he could not tell me not to apply, but he would tell me that I would have little opportunity to get the spot based on the history of the program." (Id. at 134.) Plaintiff acknowledged that Dr. Robbins had sent him the e-mail announcing the Director position and was "the same one who wrote me a nice letter of excellence in teaching, excellence in service and highly recommended me[,]" but also "throughout the time that I was

---

[4]Plaintiff cites pages 95 through 97 of Brown's deposition to support this statement; however, the record submitted by Plaintiff does not contain pages 96-97. The Court will assume the truth of the statement since the VA has not filed a reply to dispute this or any other statement.

13

there led me on to believe that I would eventually get a full-time position." (Id.) He further testified that Dr. Robbins told him he would be present at the candidate interviews, but he would not serve on the selection panel. (Id. at 134-135.)

Plaintiff applied for both positions on May 12, 2003, using the same application. He was deemed qualified for both positions and was interviewed by the same selection panel for both positions on the same day. The selection panel was comprised of Drs. Jeffrey Robbins, John Newman, John Tarpley and Ann Walia, and a Human Resources representative. (Id. at 124, 126.) Drs. Robbins, Newman and Tarpley are Caucasian. Dr. Walia is Asian Indian. Plaintiff participated in a personal interview before the panel in the morning and a telephonic interview with the panel that afternoon.

The Director position was awarded to Dr. Mark Hinkes, a white male. Plaintiff no longer challenges the award of the position to Dr. Hinkes, conceding that he was qualified. (Docket Entry No. 29, Plaintiff's Response to Defendant's Motion for Summary Judgment at 13.) Plaintiff contends, however, that the composition of the selection panel and the method of scoring the candidates was "rigged" to keep him from receiving either position.

Eleven candidates applied for and were qualified for the Staff Podiatrist position. (Docket Entry No. 21, Ex. 17.) The selection panel ranked scores and submitted the names of three candidates to Dr. Hinkes, the newly selected Chief of Podiatry. Dr. Angela Smith

14

received the best score at 59.0. Dr. Amber Tessmer, a 29-year old white female, followed second at 61.5. The panel recommended that one of them be hired. Plaintiff ranked third at 73.5, the same score he received for the Director's position. (Id. at 135, 137, 143.) Dr. Hinkes selected Dr. Smith, and Dr. Abumrad concurred in the selection. Dr. Hinkes offered the position to Dr. Smith, but she declined. He then selected Dr. Tessmer, and Dr. Abumrad again concurred. Dr. Tessmer accepted the position. (Docket Entry No. 31, Ex. 17.) Plaintiff was notified on September 15, 2003, that he was not selected for the position. Plaintiff then filed another EEO Complaint alleging race and age discrimination on November 13, 2003.

Plaintiff contends he was far more qualified for the Staff Podiatrist position that Dr. Tessmer because she was just finishing her four-year residency, she had not yet completed her board certification as required for the position, and she did not have the 25 years of experience he had. (Docket Entry No. 31, Ex. 1, Burns Depo. at 140-145; Ex. 13, Tessmer Application.) Moreover, Plaintiff had done the precise job Dr. Tessmer was hired to do. He testified "it even says in the notes, that they wanted [an] entry level person for this. They felt I was over qualified." (Id. at 145.) Plaintiff, however, felt the salary of $93,500 paid to Dr. Tessmer was not an entry-level salary, when she was paid less than $30,000 as a resident the previous year. (Id. at 145-146.)

15

Plaintiff also drew an inference that Dr. Tessmer was a friend of Dr. Hinkes and Dr. Hinkes personally handpicked her for his assistant. (Id. at 146.)

Dr. Hinkes attests he made his decisions in reliance on the position description and each candidate's qualifications. He was not aware Plaintiff previously had been removed from his fee-basis appointment and he had no knowledge Plaintiff had filed an EEO Complaint. Dr. Hinkes denies that he discriminated against Plaintiff based on race or age. (Docket Entry No. 25, Hinkes Decl.)

Plaintiff contends his prior situation concerning Dr. Crear could not have had anything to do with the VA's failure to hire him as a Staff Podiatrist in 2003 because the panel members denied knowing him in their depositions and Dr. Hinkes was not involved in the program until 2003, when he was appointed Director of Podiatry.

## II. <u>STANDARD OF REVIEW</u>

### A. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) permits a district court to dismiss a case for lack of jurisdiction over the subject matter. When a defendant challenges subject matter jurisdiction through a motion to dismiss, the plaintiff bears the burden to establish jurisdiction. <u>Moir v. Greater Cleveland Reg'l Transit Auth.</u>, 895 F.2d 266, 269 (6th Cir. 1990).

Moreover, in reviewing a motion to dismiss for failure to

16

state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), the Court must view the Complaint in the light most favorable to the non-moving party and construe all of the allegations in that party's favor.  See Sykes v. United States, 107 F.3d 421, 423 (6th Cir. 1997).  A Complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that [the non-moving party] can prove no set of facts in support of [his or her] claim which would entitle [him or her] to relief." Scheuer, 416 U.S. at 236 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

**B. Motion for Summary Judgment**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000).  The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

17

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains an issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

**A. Motion to Dismiss**

The VA moves to dismiss several aspects of the Complaint. The Court will address each ground for dismissal.

*1. Punitive damages*

The VA asks the Court to strike Plaintiff's punitive damages demand because 42 U.S.C. § 1981a(b)(1) does not permit the Plaintiff to seek punitive damages against a federal government agency. See Miller v. Runyon, 932 F. Supp. 276, 277 (M.D. Fla.

18

1996) (striking prayer for punitive damages against federal government in Title VII action). Plaintiff concedes the issue. Accordingly, Plaintiff's punitive damages demand will be stricken from the Complaint.

2. *42 U.S.C. § 1981 claim*

Next, the VA contends Plaintiff's request for relief under 42 U.S.C. § 1981 must be dismissed because a federal employee may not secure additional remedies against a federal agency by proceeding under § 1981. See <u>Jackson v. United States Postal Serv.</u>, 863 F.2d 48 (6th Cir. 1988). Plaintiff also concedes this issue. Accordingly, Count Three of the Complaint, which alleges a claim of race discrimination under § 1981, and that portion of Count Five which alleges a claim for retaliation under § 1981 will be dismissed with prejudice.

3. *Title VI*

The VA asserts that Plaintiff may not pursue a private cause of action under Title VI, citing cases from the early 1980's, but the Supreme Court decided that issue in Plaintiff's favor. <u>Alexander v. Sandoval</u>, 532 U.S. 275, 279-280 (2001) (relying on <u>Cannon v. University of Chicago</u>, 441 U.S. 677, 696-698 (1979)). Thus, the VA's Motion to Dismiss the Title VI claim for race and age discrimination stated in Count Two will be denied.

19

*4. Jury trial and types of damages*

With regard to Plaintiff's ADEA claim, the VA suggests that Plaintiff is not entitled to a jury trial or to compensatory, general, liquidated or consequential damages. Plaintiff concedes he cannot request a jury trial against the federal government under the ADEA or recover compensatory damages from the federal government for age discrimination under the ADEA. See Lehman v. Nakshian, 453 U.S. 156, 162-165 (1981) (holding public sector plaintiff may not seek jury trial under ADEA); Villescas v. Abraham, 311 F.3d 1253, 1258-1259 (10th Cir. 2002) (holding federal employees may not seek compensatory damages under ADEA). Therefore, Plaintiff's request for a jury trial under the ADEA and his demand for compensatory damages under the ADEA will be stricken from the Complaint.

Plaintiff emphasizes that he does *not* concede he is unable to recover compensatory damages for his retaliation claim under the ADEA. He points to § 623(d) of the ADEA, which tracks the retaliation language of Title VII. He contends the VA may be held liable for compensatory damages if the VA is found liable for retaliation. Plaintiff does not cite any cases to support his argument.

The Court located one case dealing with this subject. The Tenth Circuit ruled as follows:

20

We conclude that Congress did not intend to create a two-tiered system of damages under [29 U.S.C.] § 633a(c), waiving the government's immunity from open-ended damages for emotional distress related to discrimination based on retaliation, as differentiated from all other forms of discrimination. Neither the test of the statute nor the legislative history support the claim that the language in § 633a(c) contains a special subcategory of damages relating to retaliation claims. To the contrary, when Congress enacted § 633a, it omitted, for example, any provision for damages for willful discrimination, as set out in § 626(b) [pertaining to private sector plaintiffs]. It would be anomalous to conclude that Congress would decline to waive sovereign immunity for capped damages for willful discrimination, yet be deemed to have waived sovereign immunity for unlimited compensatory damages for intangible, non-economic injuries such as emotional distress (notwithstanding the former is punitive and the latter compensatory). That conclusion is further bolstered by the fact that Congress had opportunities both in 1978 and 1991 to extend common law tort compensatory damage relief to apply to federal worker suits under § 633a, and declined to do so. We must presume that Congress was aware at those times, and during all the years since 1974 when § 633a was passed, that the general rule announced by the courts was to forbid damages for emotional distress and chose not to interfere with that rule.

Villescas v. Abraham, 311 F.3d 1253, 1261 (10th Cir. 2002).

This Court finds the Tenth Circuit case is well-reasoned and the Court will follow it. Therefore, Plaintiff's demand for compensatory damages in relation to his retaliation claim under the ADEA will likewise be stricken from the Complaint.

Plaintiff further contends he can pursue liquidated damages, interest and other remedies under the ADEA that are available to a private sector employee. He reasons that § 633a(c) specifically requires federal courts to provide such relief to federal employees

"as will effectuate the purposes" of the ADEA.[5]  Because the ADEA
is meant to make whole the victims of age discrimination, Plaintiff
contends permitting private sector plaintiffs to claim damages that
public sector plaintiffs may not claim does not make sense and goes
against the intent of Congress in making the ADEA applicable to the
public sector.

The ADEA's liquidated damages provision for private sector
employees is punitive in nature, TWA v. Thurston, 469 U.S. 111, 125
(1985); Carberry v. Monarch Marking Sys., Inc., 30 Fed. Appx. 389,
2002 WL 220634 at **4 (6th Cir. 2002), and a plaintiff may recover
liquidated damages only if an employer's violation of the ADEA is
"willful."  29 U.S.C. § 626(b); Carberry, 2002 WL 220634 at **4.
The liquidated damages provision is not included in § 633a,
applicable to public sector plaintiffs.  Federal courts have held
the ADEA does not permit public sector employees to recover
general, consequential or liquidated damages under the ADEA because
the United States has not waived its sovereign immunity.  See e.g.
Smith v. Office of Personnel Mgt., 778 F.2d 256, 260-262, 263 (5th
Cir. 1985)(and cases cited therein).  The ADEA also does not permit
the recovery of general or consequential damages.  See e.g. Lyons
v. Allendale Mut. Ins. Co., 484 F. Supp. 1343, 1344 (N.D. Ga. 1980)

---

[5]The statute states: "Any person aggrieved may bring a civil
action in any Federal district court of competent jurisdiction for
such legal or equitable relief as will effectuate the purposes of
this chapter."

22

(and cases cited therein). Therefore, Plaintiff's demand for general, compensatory, liquidated or consequential damages under the ADEA will be stricken from the Complaint.

        *5. Attorney's fees*

        Finally, the VA contends Plaintiff cannot recover attorney's fees, if he prevails, under the ADEA. Although some district courts have held that public sector plaintiffs may recover attorney's fees under the ADEA, the circuit courts of appeal are uniformly holding that § 633a does not expressly provide for an award of attorney's fees against the federal government and therefore, no such award may be made. See e.g. Boehms v. Crowell, 139 F.3d 452, 462 (5th Cir. 1998); Nowd v. Rubin, 76 F.2d 25, 27 (1st Cir. 1996); Lewis v. Federal Prison Indus., Inc., 953 F.2d 1277, 1282 (11th Cir. 1992); Palmer v. GSA, 787 F.2d 300, 301-302 (8th Cir. 1986). See also Lumpkin v. Brown, 9609 F. Supp. 1339, (N.D. Ill. 1997) (holding in ADEA case against VA that plaintiffs may not recover attorney's fees); Gregor v. Derwinski, 911 F. Supp. 643, 655-656 (W.D.N.Y. 1996) (holding in physician's ADEA suit against VA that attorney's fees may not be awarded). Consequently, Plaintiff's request for attorney's fees under the ADEA will be stricken from the record.

        The Court notes that, if Plaintiff prevails on his ADEA claim, he may be entitled to seek attorney's fees for his ADEA claim under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(b), as

23

he contends. See <u>Newmark v. Principi</u>, 283 F.3d 172, 173-178 (3rd Cir. 2002) (discussing fee cap for EAJA fees included in offer of judgment in ADEA case against VA); <u>Boehms</u>, 139 F.3d at 463; <u>Nowd</u>, 76 F.3d at 28; <u>Lumpkin</u>, 960 F. Supp. at 1354. The Court does not express any opinion on whether such an attorney's fee award would be available under EAJA because the parties have not fully briefed the issue.

**B. Motion for Summary Judgment**

*1. Termination at Will*

Without extensive discussion, the VA addresses Plaintiff's claim of wrongful termination based on race by pointing out Plaintiff was a fee basis employee who could be terminated at will under 38 U.S.C. § 7405(a)(2). Thus, the VA could terminate his employment at any time with or without cause by written notice. See <u>Woods v. Milner</u>, 955 F.2d 436, 437 (6th Cir. 1992) (construing similar statute for temporary VA physicians); <u>Claus v. Gyorkey</u>, 674 F.2d 427, 433 (5th Cir. 1982) (noting physician employed by VA pursuant to affiliation agreement was terminable at will).

Plaintiff alleged in Count One of his Complaint that the "Defendants' policies and practices regarding . . . termination resulted in unequal terms and conditions of employment on the basis of race, constituting a continuing violation of Title VII." (Docket Entry No. 1 at 7.) In responding to the VA's summary judgment motion, however, Plaintiff appears to abandon any direct

24

claim that the termination of his fee-basis appointment was based on race. Rather, in his brief, under the heading "Wrongful Termination," Plaintiff argues he has "stated sufficient facts to establish a prima facie case *for retaliation* regarding his wrongful termination claim." (Docket Entry No. 29 at 22, 23 (emphasis added).) The Court will discuss the retaliation claim more fully below. Thus, to the extent Count One of the Complaint stated a claim for unlawful discrimination based on race under Title VII for the termination of Plaintiff's fee-basis appointment, Plaintiff abandoned the claim and Defendant is entitled to summary judgment on Count One.

> 2. *Sexual misconduct as a basis for termination*

The VA next asserts that Plaintiff was lawfully discharged from his fee basis appointment due to his misconduct in sexually harassing Dr. Crear. The VA contends that, even if Plaintiff can establish a prima facie case of race discrimination in his termination pursuant to <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), the VA has proffered a legitimate non-discriminatory reason for Plaintiff's termination, and Plaintiff has not come forward with sufficient evidence to establish its reason was a pretext for discrimination. The VA cites numerous cases to support its view.

The VA's argument, while proper in light of Plaintiff's pleading in Count One of the Complaint, misses the crux of

25

Plaintiff's theory on summary judgment that he continually asked for an FTE position, the VA refused to grant him an FTE position based on race, and his opposition to the VA's conduct in denying him an FTE based on race led to his retaliatory termination. Because the VA did not file a reply brief, it has not taken the opportunity to address Plaintiff's theory.

To establish a prima facie case of Title VII retaliation, Plaintiff must show that: (1) he engaged in activity protected by Title VII; (2) the exercise of protected rights was known to Defendant; (3) Defendant thereafter took adverse employment action against the Plaintiff, or the Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. <u>Wade v. Knoxville Util. Bd.</u>, 259 F.3d 452, 463 (6th Cir. 2001); <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 792 (6th Cir. 2000). A plaintiff can establish "protected activity" under the "opposition clause" or the "participation clause" of Title VII. Although Plaintiff does not expressly say so, his retaliation claim is apparently brought under the "opposition clause," that is, he opposed a practice of the employer that is unlawful under Title VII. <u>See</u> <u>Johnson v. University of Cincinnati</u>, 215 F.3d 561, 578 (6th Cir. 2000). In other words, he engaged in "protected activity" by opposing the VA's practice of denying him an FTE based on race.

26

Once a plaintiff makes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the decision. Id. Plaintiff must then demonstrate that the proffered reason was not the true reason for the adverse employment action, i.e., the reason was a mere pretext for discrimination. Id. at 578-579. The Plaintiff must show by a preponderance of the evidence either that the VA's proffered reason (1) had no basis in fact; (2) did not actually motivate its employment actions; or (3) was insufficient to motivate the employment action. See Anthony v. BTR Automotive Sealing Sys., 339 F.3d 506, 516 (6th Cir. 2003).

The VA proffers that it justifiably discharged Plaintiff for sexual harassment misconduct.[6] Having proffered a legitimate, non-discriminatory reason for the termination of Plaintiff's appointment, Plaintiff must come forward with evidence of pretext.

The Court finds Plaintiff has failed to meet his burden to show pretext. Plaintiff presented no direct evidence that the VA discriminated against him based on his race in terminating his appointment. In fact, the evidence shows that, in December 2002, the Staff Podiatrist and the fee-basis podiatrists were all African American. Plaintiff claims he was treated differently because he

---

[6]The VA asserted this defense in the context of what appeared from the Complaint to be a wrongful termination claim. However, the defense is relevant also to Plaintiff's asserted retaliation theory because the analysis used to resolve a termination claim and a retaliation claim is the same.

27

was the only one of 46 Directors nationwide who held a fee-basis appointment, yet he produced no evidence other than his own speculative testimony to support the claim. The VA produced evidence, which Plaintiff did not refute, showing that several Directors in similar positions held one-half time positions. Further, Plaintiff did not refute the VA's evidence that Dr. Dutt asked for FTE positions for his fee-basis podiatrists on more than one occasion, and that he met resistance from management because of budgetary constraints, not because of race. Plaintiff acknowledged he was told the reason an FTE was denied to him was because of a "hiring freeze."

Plaintiff testified that he asked for a full-time position fifteen days before his appointment was terminated. Thus, he believes he established a sufficient causal connection between his request for a full-time job and his termination to proceed to trial on a race retaliation claim, citing Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000), and Brown v. ASD Computing Ctr., 519 F. Supp. 1096, 1116 (S.D. Ohio 1981), aff'd sub nom. Brown v. Mark, 709 F.2d 1499 (6th Cir. 1983). The same evidence that Plaintiff contends shows a causal connection to establish a prima facie case of retaliation works against him on the issue of pretext. Plaintiff continued to work the fifteen days after he requested an FTE, without immediate termination; yet, the VA ended his appointment on the very day management became aware of Dr.

Crear's sexual harassment allegations against the Plaintiff. Plaintiff has not shown by a preponderance of the evidence on summary judgment either that the VA's proffered reason for ending his appointment (1) had no basis in fact; (2) did not actually motivate its employment actions; or (3) was insufficient to motivate the employment action. See Anthony, 339 F.3d at 516. Further, Plaintiff served at the will of the VA and he could be terminated for good cause or no cause at all, so long as he received written notice of the termination.

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim under Title VII related to the termination of his fee-basis appointment will be GRANTED.

### 3. Failure to hire for Staff Podiatrist position

Next, the VA contends that Plaintiff was not qualified for the Staff Podiatrist position in 2003 because of after-acquired evidence of Plaintiff's wrongdoing in relation to Dr. Crear, citing McKennon v. Nashville Banner Publishing Co., 513 U.S. 352 (1995).[7] The VA relies on the Declaration of Patricia Brown to the effect that Plaintiff's misconduct, as determined by the EEOC, was so severe that it disqualified him from selection for the position of Staff Podiatrist. Plaintiff fails to address this issue. His brief emphasizes he established a prima facie case of race

---

[7]The Court notes the VA did not specifically raise after-acquired evidence as an affirmative defense in its Answer. (Docket Entry No. 7 at 6-7.)

29

discrimination, age discrimination and retaliation for engaging in the protected Title VII activity of filing an EEO complaint.

The Court concludes from the evidence presented that Plaintiff's alleged misconduct in 2002 would not have disqualified Plaintiff from the position of Staff Podiatrist awarded in 2003. First, the VA's knowledge of the alleged misconduct was not acquired after Plaintiff's termination as McKennon contemplates. The VA knew the day it terminated Plaintiff's appointment the extent of Dr. Crear's sexual harassment allegations against Plaintiff. In fact, the VA seeks summary judgment in its favor on the ground that it had a legitimate, non-discriminatory reason for ending Plaintiff's appointment. The VA took immediate action without conducting an investigation. Therefore, the EEOC's later ruling in Dr. Crear's favor does not provide any "after-acquired" evidence to support termination that the VA did not already have.

Second, the evidence shows Plaintiff was one of eleven candidates for the Staff Podiatrist position, the VA deemed him qualified for the position, the selection panel interviewed him, and the selection panel ranked him third on the list of candidates for possible hiring sent to Dr. Hinkes. If the VA had thought Plaintiff was disqualified to hold the Staff Podiatrist position because of his alleged misconduct, the VA could have deemed him disqualified from the beginning of the selection process, but the VA did not. It is true that some of the physicians on the

30

selection panel may have been unaware of Plaintiff's previous circumstances. But Dr. Robbins, Director of Podiatry for the entire VA, sent Plaintiff the e-mail announcing the Tennessee Director's position and participated in the selection process for the Director and Staff Podiatrist positions. Human Resources was involved in the termination of Plaintiff's fee-basis appointment and also had a representative present at the interviews for Staff Podiatrist. Director Pennington drafted the memorandum to the Executive Resources Board explaining the process that was used to select the Staff Podiatrist, including the ranking of the three finalists, and no where did he mention that Plaintiff was disqualified for selection because of any previous sexual harassment misconduct at the VA. (Docket Entry No. 21, Ex. 17.) The individuals involved in selecting Dr. Tessmer testified they chose her because she had qualities they preferred, not because of Plaintiff's prior alleged misconduct.

Accordingly, the VA's motion for summary judgment on this ground will be DENIED.

4. *Retaliation*

Finally, the VA contends Plaintiff filed EEO complaints in March and November 2003, after he was terminated in December 2002. Therefore, Plaintiff cannot proceed on a theory that his termination was in retaliation for protected EEO activity. The Court agrees and notes that these facts provide another basis, in

31

addition to that previously explained above, why Plaintiff's retaliation claim related to his termination cannot proceed.

With regard to retaliation related to the hiring of a Staff Podiatrist, the VA contends Dr. Hinkes averred he was not aware that Plaintiff had engaged in any EEO activity at the time he hired Dr. Tessmer over Plaintiff. Plaintiff produced evidence, however, that Patricia Brown, the Human Resources Department, and Director Pennington knew Plaintiff had filed an EEO Complaint in late January 2003. An individual from Human Resources participated in the selection panel, and Director Pennington drafted the memorandum that detailed the hiring process for the Staff Podiatrist position. The Court concludes Plaintiff has presented sufficient evidence to withstand the Motion for Summary Judgment on his retaliation claim related to the hiring of a Staff Podiatrist.

## IV. <u>CONCLUSION</u>

For all of the reasons stated, (1) Defendant's Motion for Summary Judgment (Docket Entry No. 19) will be GRANTED IN PART AND DENIED IN PART. The Motion will be GRANTED because: (a) Plaintiff abandoned his Title VII wrongful termination claim as stated in Count One of the Complaint and Count One will be DISMISSED WITH PREJUDICE; and (b) with regard to Plaintiff's retaliation claim relating to the termination of his fee-basis appointment in December 2002, (i) Defendant offered a legitimate, non-discriminatory reason for the termination decision and Plaintiff

32

failed to establish Defendant's reason was a pretext for retaliation, and (ii) Plaintiff's filing of EEO complaints in March and November 2003, after his termination in December 2002, could not provide a basis for Defendant to retaliate against Plaintiff in December 2002.  Therefore, such retaliation claim relating to the termination of Plaintiff's fee-basis appointment, as stated under Title VII in Count Five of the Complaint, will be DISMISSED WITH PREJUDICE.  Defendant's Motion for Summary Judgment will be DENIED on all other grounds raised.

Defendant's Motion to Dismiss (Docket Entry No. 22) will be GRANTED IN PART AND DENIED IN PART.  The Motion to Dismiss will be GRANTED IN PART because:  (a) Plaintiff may not pursue a cause of action against Defendant, a federal agency, under 42 U.S.C. § 1981; (b) Plaintiff is not entitled to a jury trial or to compensatory, general, liquidated or consequential damages on his discrimination and retaliation claims brought against Defendant, a federal agency, under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.*; (c) Plaintiff is not entitled to recover punitive damages against Defendant, a federal agency, on any of his claims under 42 U.S.C. § 1981a(b)(1); and (d) Plaintiff is not entitled to recover attorney's fees under the ADEA against Defendant, a federal agency.  The Motion to Dismiss will be DENIED IN PART because Plaintiff does have a private right of action against the Defendant, a federal agency, under Title VI.

33

In light of these rulings, Count Three of the Complaint, asserting a claim for racial discrimination under 42 U.S.C. § 1981, and that portion of Count Five referencing a claim of retaliation under 42 U.S.C. § 1981 will be DISMISSED WITH PREJUDICE. Further, Plaintiff's demand for punitive damages will be stricken from the Complaint.

Claims remaining for jury trial are: Count Two, alleging race and age discrimination under Title VI, and Count Five, alleging retaliation under Title VI and Title VII.

The claim remaining for non-jury trial is Count Four, alleging age discrimination under the ADEA.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE